**No. 23-11473-D**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

Sarah Kavianpour, M.D.,

*Plaintiff/Appellant*,

v.

Board of Regents of the University System of Georgia, et al.,

*Defendants/Appellees*.

Appeal From the United States District Court
for the Northern District of Georgia

No. 1:20-cv-00152-MLB-RGV

_____

**APPELLANT'S OPENING BRIEF**

_____

BUCKLEY BALA WILSON MEW

Edward D. Buckley
Georgia Bar No. 092750
edbuckley@bbwmlaw.com
Anita K. Balasubramanian
Georgia Bar No. 372029
abala@bbwmlaw.com
600 Peachtree Street NE, Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

LAW OFFICE JOHN P. BATSON

John P. Batson
Georgia Bar No. 042150
jpbatson@aol.com
1104 Milledge Road
Augusta, GA 30904
Telephone: (706) 737-4040
Facsimile: (706) 736-3391

*Attorneys for Appellant Dr. Kavianpour*

*No. 23-11473-D*

*Kavianpour v. Board of Regents of the University System of Georgia, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The following is a list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this case:

Anand, Justin S., United States Magistrate Judge;

Arnold, Debra, Defendant/Appellee;

Balasubramanian, Anita K., Counsel for Plaintiff/Appellant;

Batson, John P., Counsel for Plaintiff/Appellant;

Board of Regents of the University System of Georgia,
    Defendant/Appellee;

Brown, Michael L., United States District Judge;

Buckley, Edward D., Counsel for Plaintiff/Appellant;

Buckley, Bala, Wilson, Mew, LLP, Law Firm of Plaintiff/Appellant;

Carr, Christopher, Counsel for Defendants/Appellees:
    Board of Regents of the University System of Georgia, Debra Arnold,
    Phillip Coule (as employee of BOR only), Brooks Keel;
    Walter Moore, Susan Norton, and Clay Sprouse;

Coule, Phillip, Defendant/Appellee;

Coward, Elliott L., Counsel for Defendant/Appellee Augusta
    University Medical Center, Inc.;

C-1 of 4

*No. 23-11473-D*

*Kavianpour v. Board of Regents of the University System of Georgia, et al.*

Dugas, Lauren C., Counsel for Defendant/Appellee Augusta University Medical Center, Inc.;

Georgia Department of Administrative Services-Insurer of Defendants/Appellees: Board of Regents of the University System of Georgia, Debra Arnold, Phillip Coule (as employee of BOR only), Brooks Keel; Walter Moore, Susan Norton, and Clay Sprouse;

Graebar, Mary Catherine, Assistant Attorney General and Counsel for Defendants/Appellees Board of Regents of the University System of Georgia, Debra Arnold, Phillip Coule (as employee of BOR only), Brooks Keel, Walter Moore, Susan Norton, and Clay Sprouse;

Georgia Department of Law, Law Firm of Defendants/Appellees: Board of Regents of the University System of Georgia, Debra Arnold, Phillip Coule (as employee of BOR only), Brooks Keel; Walter Moore, Susan Norton, and Clay Sprouse;

Hamilton, Dan W., Special Attorney General, and Counsel for Defendants/Appellees Board of Regents of the University System of Georgia, Debra Arnold, Phillip Coule (as employee of BOR only), Brooks Keel, Walter Moore, Susan Norton, and Clay Sprouse;

Horne, Wesley, Defendant/Appellee;

Kavianpour, Sarah M., Plaintiff/Appellant;

Keel, Brooks, Defendant/Appellee;

*No. 23-11473-D*

*Kavianpour v. Board of Regents of the University System of Georgia, et al.*

Kolb, Ryan A., Assistant Attorney General and Counsel for
    Defendants/Appellees Board of Regents of the University
    System of Georgia, Debra Arnold, Phillip Coule (as employee
    of BOR only), Brooks Keel, Walter Moore, Susan Norton, and
    Clay Sprouse;

Medical College of Georgia Health, Inc., Defendant/Appellee;

Moore, Walter, Defendant/Appellee;

Morris, Manning & Martin, LLP, Law Firm of Defendant/Appellee
    Augusta University Medical Center, Inc.;

Norton, Susan, Defendant/Appellee;

Sprouse, Clay, Defendant/Appellee;

Stoff, Katherine P., Senior Assistant Attorney General and
    Counsel for Defendants/Appellees Board of Regents of the
    University System of Georgia, Debra Arnold, Phillip Coule
    (as employee of BOR only), Brooks Keel, Walter Moore,
    Susan Norton, and Clay Sprouse;

Threlkeld, Robert C., Counsel for Defendant/Appellee Augusta
    University Medical Center, Inc.;

Vineyard, Russell G., United States Magistrate Judge;

*No. 23-11473-D*

*Kavianpour v. Board of Regents of the University System of Georgia, et al.*

Webb, Bryan K., Deputy Attorney General and Counsel for Defendants/Appellees: Board of Regents of the University System of Georgia, Debra Arnold, Phillip Coule (as employee of BOR only), Brooks Keel; Walter Moore, Susan Norton, and Clay Sprouse.

Respectfully submitted this 6th day of September, 2024.

BUCKLEY BALA WILSON MEW    LAW OFFICE JOHN P. BATSON

/s/ Edward D. Buckley            /s/ John P. Batson
Edward D. Buckley                John P. Batson
Georgia Bar No. 092750           Georgia Bar No. 042150
edbuckley@bbwmlaw.com            jpbatson@aol.com
Anita K. Balasubramanian         1104 Milledge Road
Georgia Bar No. 372029           Augusta, GA 30904
abala@bbwmlaw.com                Telephone: (706) 737-4040
600 Peachtree Street NE, Suite 3900    Facsimile: (706) 736-3391
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

*Attorneys for Appellant*

C-4 of 4

## STATEMENT REGARDING ORAL ARGUMENT

This is a case not just about the Plaintiff, but the trial court's decision can have a deleterious effect about the safety and operation of the federally-funded residency training system, undermining the policies and procedures of the Accreditation Council for Graduate Medical Education (ACGME) that are basis of our nation's system for training doctors to become specialists in the public's interest while protecting patient safety during training.

Essentially, the District Court held that the resident physician is an at-will employee of the hospital's administrative staff and is not protected by the ACGME-required contract between the resident and the Sponsoring Institution, that provides deliberative processes connected to a resident's good performance and provisions of notice and opportunity to cure deficiencies.

Oral argument is requested to help the Court understand a voluminous record in a case where the District Court is challenged for its failure to construe pleadings and evidence in the Plaintiff's favor.

Although the District Court found that no facts are in dispute, a reasonable reading of the record raises significant concerns about that conclusion. Additionally, there are errors of law as to the correct use of the 'special needs' exception to the Fourth Amendment and the direct threat inquiry in an ADA regarded-as case.

i

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ................................................................... C-1of 4

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ...........................................................................v

STATEMENT OF JURISDICTION ................................................................x

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE ......................................................................2

    COURSE OF PROCEEDINGS .................................................................2

    STATEMENT OF FACTS ........................................................................3

    STANDARD OF REVIEW ....................................................................14

SUMMARY OF ARGUMENT .....................................................................15

ARGUMENT AND CITATION OF AUTHORITIES .........................................16

    I.    The drug testing of Dr. Kavianpour violated the Fourth Amendment. ......16

      A.   The testing was not random nor from a uniform selection process. ..........17

      B.  There was no reasonable suspicion for the challenged tests.......................18

      C.  Qualified immunity should be denied.......................................................20

II.    The Complaint properly states a procedural due process violation for the termination. ................................................................................21

III.   The Complaint properly alleges that the suspension-termination was a breach of contractual requirements in HS 13.0. ..................................24

IV.   AUMC's suspension of Dr. Kavianpour was regarded-as discrimination..27

A.    As opposed to mere or current drug use, Dr. Coule refers to a substance abuse disorder as a reason for the suspension.....................................29

B.   Plaintiff's conduct was not an independent nor legitimate reason. ............32

V.    BOR is liable under respondeat superior for Dr. Coule's suspension. .......34

VI.   The termination by BOR was regarded-as-disabled discrimination...........35

A.   BOR regarded Dr. Kavianpour as having a substance abuse disorder when terminating her. ..............................................................................37

B.   BOR's purported legitimate nondiscriminatory reason is insufficient. ......40

C.   BOR's reason for the termination is pretext for its unlawful motives........42

1.    Pretext is shown by concealing the actual decisionmaker......................44

2.    The circumstances of the allegedly missed test.....................................45

3.    Deviations from standard procedures. ...................................................46

VII.  AUMC retaliated against Dr. Kavianpour by suspending her...................50

A.    Dr. Coule's awareness of Plaintiff's protected activity...........................50

iii

B.      AUMC's proffered reason is insufficient and pretextual .........................53

VIII.   BOR terminated Dr. Kavianpour in retaliation for her protected

complaints. ................................................................................................55

CONCLUSION .........................................................................................................57

CERTIFICATE OF COMPLIANCE .......................................................................58

CERTIFICATE OF SERVICE..................................................................................59

iv

# TABLE OF AUTHORITIES

**Cases**

*Alvarez v. Royal Atl. Devs.*, Inc.,

610 F.3d 1253 (11th Cir. 2010)......................................................40, 41, 53

*Am. Acad. of Gen. Physicians, Inc. v. LaPlante*,

340 Ga. App. 527 (Ga. Ct. App. 2017) ........................................................27

*Augusta Judicial Circuit Office of the Pub. Def. v. Hodge-Peets*,

370 Ga. App. 819 (2024) ..............................................................................35

*Barber v. Cellco P'ship,* 808 F. App'x 929 (11th Cir. 2020)..................................36

*Benavidez v. City of Albuquerque*, 101 F.3d 620 (10th Cir. 1996) ...................17, 20

*Berry v. Crestwood Healthcare LP*, 84 F.4th 1300 (11th Cir. 2023)......................37

*Bowen v. Rubin*, 385 F. Supp. 2d 168 (E.D.N.Y. 2005). .......................................34

*Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998) ................................................34

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)..................................22

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*,

555 U.S. 271 (2009)......................................................................................52

*Damon v. Fleming Supermarkets of Fla., Inc.*,

196 F.3d 1354 (11th Cir. 1999).....................................................................31

*Dennis v. Sparks*, 449 U.S. 24 (1980) ...................................................................24

*Drake v. Delta Air Lines, Inc.*, 147 F.3d 169 (2d Cir. 1998) ................................17

v

*EEOC v. Comcast of Ga., Inc.*,

    560 F. Supp. 2d 1300 (N.D. Ga. 2008) .........................................................53

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000) ...........................44

*Ford v. Dowd*, 931 F.2d 1286 (8th Cir. 1991) .......................................................17

*Henson v. City of Atlanta,*

    No. 1:17- cv-03024- JPB-RGV,

    2019 U.S. Dist. LEXIS 238612 (N.D. Ga. June 18, 2019). .........................33

*Hope v. Pelzer,* 536 U.S. 730 (2002). .....................................................................21

*Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*,

    848 F.2d 544 (5th Cir. 1988*)*........................................................................24

*Hurlbert v. St. Mary's Health Care Sys., Inc.*,

    439 F.3d 1286 (11th Cir. 2006)...............................................................46, 56

*Jackson v. W. Va. Univ. Hosps., Inc.*,

    1:10CV107, 2011 U.S. Dist. LEXIS 42428

    (N.D.W. Va. Apr. 19, 2011).........................................................................35

*Jones v. City of Boston*, 752 F.3d 38 (1st Cir. 2014) .............................................30

*Jordan v. City of Union City, Ga.*,

    94 F. Supp. 3d 1328 (N.D. Ga. 2015)

    *aff'd on other grounds*, 646 F. App'x 736 (11th Cir. 2016) .........................31

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019) ...........................28, 36

*Loftus v. Clark-Moore*, 690 F.3d 1200 (11th Cir. 2012)..........................................20

*Lowe v. Ala. Power Co.*, 244 F.3d 1305 (11th Cir. 2001)........................................28

*Lowe v. Pettway*,

    No. 2:20-cv-01806-MHH

    2023 U.S. Dist. LEXIS 53302 (N.D. Ala. Mar. 28, 2023)............................29

*Luckey v. Fulton Cty.*,

    No. 1:05-CV-714-RWS-AJB

    2006 U.S. Dist. LEXIS 110807 (N.D. Ga. July 12, 2006)............................31

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)......................................55

*Mercer v. Mitchell*, 908 F.2d 763 (11th Cir. 1990)..................................................34

*Milligan v. Rambosk*,

    No. 2:20-cv-403-FtM-29MRM

    2022 U.S. Dist. LEXIS 32773 (M.D. Fla. Feb. 24, 2022) ...........................47

*National Treasury Employees Union v. Von Raab,*

    489 U.S. 656 (1989)..............................................................................17, 20

*Nukote Int'l, Inc. v. Office Depot, Inc.*,

    No. 09-82363

    2011 U.S. Dist. LEXIS 76088 (S.D. Fla. July 14, 2011).............................37

*Reed v. Forney Indus.*, Inc., 800 F. App'x 782 (11th Cir. 2020) ............................42

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ................................44

vii

*Rodriguez v. ConAgra Grocery Prods. Co.*,

    436 F.3d 468 (5th Cir. 2006)..................................................................47

*Ryan v. Ill. Dep't of Children & Family Servs.*,

    185 F.3d 751 (7th Cir. 1999)..................................................................22

*Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990) ...............................55

*Street v. AU Health Sys. Inc. & Coule*,

    No. 2021ECV0266 (Ga. Super. Ct. Columbia Cnty. June 6, 2024) .............23

*Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939 (11th Cir. 2023) .............................37

*Voudy v. Sheriff of Broward Cnty. Fla.*,

    701 F. App'x 865 (11th Cir. 2017)................................................................40

*West v. Atkins*, 487 U.S. 42 (1988)..........................................................24

*Williams v. Bd. of Regents*,

    No. CV 120-100,

    2022 U.S. Dist. LEXIS 177575 (S.D. Ga. Sep. 29, 2022) ...........................24

*Williams v. Montgomery*, 742 F.2d 586 (11th Cir. 1984) .......................................40

*Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999) ................................55

*Zinermon v. Burch*, 494 U.S. 113 (1990) ...............................................22

**Statutes**

28 U.S.C. § 1367 ........................................................................... vii

28 U.S.C. §1291 ........................................................................... vii

28 U.S.C. §1331 ........................................................................................ vii

29 U.S.C. § 794(a)…………………………………………………..27, 35, 50, 55

42 U.S.C. §§ 12101 et seq.…………………………………………..27, 35, 50, 55

42 U.S.C § 12102(4)(D) .................................................................................38

42 U.S.C. § 12102(3)(B) ...............................................................................37

42 U.S.C. § 12114(a)-(b)...............................................................................28

**State Statutes**

O.C.G.A. §§ 45–20–90 through 93 .........................................................18, 21

O.C.G.A. §§ 45-20-110 through 45-20-111 ..................................................19

**Treatises**

Restat. 2d of Agency, § 226 ..........................................................................35

**Regulations**

82 Fed. Reg. 7920-68 (Jan. 23, 2017) ..........................................................19

Ga. Comp. R. & Regs. r. 478-1.21C ........................................................18, 21

**Constitutional Provisions**

U.S. Const. amend. IV...................................................................................16

U.S. Const. amend. XIV................................................................................21

## STATEMENT OF JURISDICTION

This case includes constitutional and ADA and Rehabilitation Act claims, presenting federal question jurisdiction under 28 U.S.C. §1331. The breach-of-contract claim invokes supplemental jurisdiction, 28 U.S.C. § 1367.

This is a direct appeal from the district court, which entered a final judgment disposing of all claims on 2023.03.31. [Doc. 269] Appellant moved to reconsider 2023.04.28 [Doc. 272] and timely filed a notice of appeal 2023.04.30. [Doc. 273] After reconsideration denial 2023.12.01 [Doc. 291], an amended notice of appeal was filed 2023.12.29. [Doc. 293]

This Court has appellate jurisdiction. 28 U.S.C. §1291.

x

**STATEMENT OF THE ISSUES**

1.      Did the Court err in dismissing Appellant's Fourth Amendment claim challenging the drug testing?

2.      Did the Court err in dismissing Appellant's claim that the termination violated procedural due process?

3.      Did the Court err in dismissing Appellant's claim that Appellees breached their contract with Dr. Kavianpour when terminating her?

4.      Did the Court err in granting summary judgment to AUMC on the claim that the suspension was regarded-as-disabled discrimination in violation of the ADA and as to BOR the Rehabilitation Act?

5.      Did the Court err in finding that Appellant waived her argument that Dr. Coule was an agent of BOR when suspending Dr. Kavianpour?

6.      Did the Court err in granting summary judgment for BOR on the regarded-as-disabled discrimination claim for the termination under the Rehabilitation Act?

7.      Did the Court err in its summary-judgment grant to AUMC on the retaliatory suspension claim under the ADA?

8.      Did the Court err in its summary-judgment grant to BOR for the retaliatory termination claim under the Rehabilitation Act?

## STATEMENT OF THE CASE

This is an employment case with claims under the Fourth Amendment, Due Process Clause, breach of contract, and regarded-as-disabled discrimination and retaliation under the ADA and Rehabilitation Act.

## COURSE OF PROCEEDINGS

The amended, operative complaint [Doc. 29] included in relevant part the following claims: breach of contract claims against BOR and AUMC relating to HS 13.0 procedures for discipline [*id.* Count I]; (2) regarded-as-disabled discrimination against BOR and AUMC for the suspension and termination [*id.* Counts 8 & 12]; (3) retaliation for complaining about ADA and Rehabilitation Act violations against BOR and AUMC for the suspension and termination [*id.* Count 9]; (4) a Fourth Amendment claim for drug testing against Appellees Arnold and Norton [*id.* Count XIV]; and (5) a procedural due process violation against Appellees Arnold, Norton, and Dr. Coule. [*Id.* Count XV]

The Court granted Defendants' motion to dismiss as to 1,4, and 5: the breach of contract for HS 13, the Fourth Amendment, and due process claims. [Doc. 69]

Appellees BOR and AUMC filed motions for summary judgment for the remaining claims of disability discrimination and retaliation. [Docs. 199 & 207] Dr. Kavianpour responded [Docs. 229 & 230] and also filed her own motion for summary judgment. [Doc. 209] The District Court granted summary judgment to

2

Appellees on the disability discrimination and retaliation claims. [Doc. 269]

Appellant moved to reconsider [Doc. 272] which was denied. [Doc. 291]

## STATEMENT OF FACTS

**Dr. Kavianpour's hiring**

Dr. Kavianpour was in the top 10% of her medical school class. [Doc. 216 at 1] After about twenty-seven residency interview invitations, Dr. Kavianpour matched into neurological surgery at the Medical College of Georgia ("MCG") on 2018.03.16. [*Id*. at 2]

Dr. Kavianpour submitted a pre-employment drug screen on 2018.06.25. [Doc. 207-2 ¶¶9-10]. When notified of an initial THC finding of 19 ng/mL by Medical Review Officer Dr. Foster, she requested a split sample reconfirmation. [Doc. 189-7; Doc. 188 at 69:8-13.] Subsequently, Dr. Kavianpour met with Graduate Medical Education (GME) Dean, Dr. Moore, about the collection process and no split sample. [Doc. 189 at 88:7-23; 102:15-104:17; 110:25-112:11] Dr. Moore requested, and Kavianpour wrote a memo with correct law, showing recollection and cancellation was required. [*Id*.; Doc. 189-9 at 2; Doc. 188 at 56:18-25, 59:1-11, 64:7-65:19; Doc. 222-7 at 9][1]

---

[1]    At dismissal, BOR argued "that the State Personnel Board Rules "are inapplicable [to her] case[.]" [Doc. 34 at 16-18 (citations omitted); Doc. 52 at 6-9 (citations omitted)]," which led to erroneous findings. [Doc. 61 at 133-5; Doc. 69 at 16] However, during discovery, BOR changed its position indicating that

Recollection was granted, which was negative, so Dr. Kavianpour was "cleared" and hired [Doc. 194 at 224:13-15; Doc. 188 at 72:9-73:2] without a monthly drug testing condition. [Doc. 230-3 at 3-4 ¶¶13-14].

**Dr. Kavianpour's Residency**

Dr. Kavianpour's contract recites that her residency training  occurs at AUMC and is subject to BOR's AU and USG policies incorporated by reference, but House Officer[2] policies ("GME" policies)[3] govern certain conditions of employment [Doc. 3-2].

GME policies must align with ACGME policies, [Doc. 177-1 (30(b)(6)) 10:14-17] and comply with USG policies. [*Id*. at 10:9-13]. For House Staff, ACGME requirements supersede all other policies. [Doc. 177-1 (30(b)(6)) 39:23-42:11, 44:22-45:3; Doc. 221 at 201, 209-210]

Under the signed affiliation agreements between Defendants AUMC and BOR, "AUHS agrees and acknowledges that Regents intends that AU Medical Center will continue to serve as the primary teaching hospital and clinics for Trainees participating in any academic or clinical programs of AU," [Doc. 204-8 at 13] and

---

O.C.G.A. §§ 45-20-110 through 45-20-111 (pre-employment law) and Ga. Comp. R. & Regs. 478-1-.21 [Doc. 193-14] are applicable. [Doc.147-20 at 7-10; Doc. 178-31 at (b); Doc. 188 at 13:6-11; Doc. 193 at 39:14-23].

[2]    "House Officer," "House Staff" or "resident" are interchangeable.

[3]    Policies are regularly edited and added online. Materially relevant HS policies are found at Doc. 228-24.

"AUHS and the President shall cooperate to ensure that Trainees may complete their Education Programs in accordance with the requirements of ACGME…" [*Id.* at 14][4]

The "Terms and Conditions of Housestaff Service to AU Health," exhibit to affiliation agreement between Appellees, expressly indicates that the House Officer contract established "the process for removal of residents from clinical duties for cause." [Doc. 178-13 at 3(¶6b)].[5]

**August 21 memo**

On August 21, 2018, HR's Norton and Arnold presented Dr. Kavianpour with a memo that misrepresents monthly testing of only her for 12 months as lawful random drug testing under Georgia law. [Doc. 194-1] Dr. Kavianpour objected to their memo's misuses of random drug testing and a void pre-employment test. [Doc. 189 at 167-172; Doc. 186 at 32:18-25, 33:7-11; Doc. 208-10 at 1]

The August 21 memo was neither a contract, nor a written agreement. [Doc. 194-1; Doc. 186 at 33:12-15; Doc. 194 at 267:23–268:2.]. The Neurosurgery

---

[4]    The ACGME-accredited Sponsoring Institution (SI) for MCG includes BOR's Augusta University ("AU") and AU Medical Center Inc. ("AUMC"), MCG's primary teaching hospital. [Doc. 178-1 (30(b)(6)) at 98:16-100:21] The MCG SI Governing Body is composed of the CEO of AUMC, CMO of AUMC, CEO of AU Medical Associates, and BOR's Dean of MCG and Vice Dean of Academic Affairs. [Doc. 221 at 192-193]

[5]    Undisputed. [Doc. 226 at 18-20; Doc. 224-34 at 18-19]

Department had no role in creating the monthly testing. [Doc. 178-1 (30(b)(6)) at 156:2-7]

Appellees did not require drug testing between Kavianpour's hiring in July through September 17, 2018. [Doc. 216 at 5 ¶20] Pursuant to the memo, Dr. Kavianpour submitted to six unannounced tests (Sept. 17, Oct. 17, Oct. 19, Nov. 14, Dec. 5, and Jan. 31), which were negative. [Doc. 230-3 at 2 ¶3b]

Nobody actually believed Plaintiff was currently using drugs, [Doc. 192 at 52:10-13, 53:1-4, 152:21-2; Doc. 197 at 44:8-18; Doc. 177-2 at 147] but Defendants wanted to monitor her like an addict with monthly drug tests, a cover for risk management purposes. [Doc. 186-14 at 12-13] Dr. Coule admitted that the monthly testing is "better referred to as a monitoring program" for those who "have a substance abuse problem." [Doc. 177-2 at 37] However, it was not a genuine monitoring program because, as Dr. Foster explained, monitoring occurs only after an admission to a substance abuse problem and testing becomes a "condition of their employment." [Doc. 178-12 at 332:1-332:15] Kavianpour neither admitted to a problem nor was it an employment condition. [Doc. 230-3 at 3-5 ¶¶10-18] Norton admitted that they created the August memo because testing was not a condition of hire. [Doc. 194 at 190:4-192:4].

BOR's 30(b)(6) witness admitted that the memos to implement monthly testing [Doc. 194-1; Doc. 186-11 at 2] were neither contractual nor policy, and

6

month-to-month drug testing was not required as a term and condition of Kavianpour's residency. [Doc. 178-1 at 46:14-24, 47:9-48:18, 49:16-19, 55:11-25, 67:23-68:1, 159:18-160:14]

BOR admitted the testing to which they subjected Dr. Kavianpour was not lawful random drug testing, based on neutral criteria required by policy, [Doc. 208-2 (BOR Resp. Pl. RFA) at 7-11 ¶¶9-11; Doc. 188 (30(b)(6)) at 86:25-87:16; Doc. 194 at 210:18-211:20] and Kavianpour was not tested under a "For Cause" policy. [Doc. 208-2 at 5-7 ¶¶5-7; Doc. 194 at 109:2-7].

Norton admitted that the challenged testing was not authorized by written policies. [Doc. 194 at 188:10-15]

On 2018.12.13, Kavianpour contacted GME's Dr. Moore and discussed test timing that conflicted with her responsibilities and offered voluntary tests, but he took no action. [Doc. 207-2 at 32 ¶107; Doc. 190 at 63:11-64:8].

Norton admitted in deposition that Dr. Kavianpour never refused to be drug tested. [Doc. 194 at 155:20-23]

**January and February 2019**

Dr. Kavianpour was not expected to test on days off. [Doc. 178-1 (30(b)(6)) at 84:1-85:5]. However, when Kavianpour was off-duty on 2019.01.17, Arnold requested a test. In an email response copying Neurosurgery Program Director, Dr.

7

Macomson, Kavianpour asked to meet with Norton and Arnold to discuss the timing and whether justified by law or policy.

Although "compliant," [Doc. 194-20] HR's Norton and Arnold, along with Clark Speese and Greg Bryan, in-house counsel for AUMC and AU respectively, issued Kavianpour another memo on 2019.01.31 describing her clinical duties as an "excuse" for not testing and extended testing. [Doc. 228-26 at 1, 6; Doc. 186-11 at 2; Doc. 186 at 183:15-184:20] Dr. Kavianpour responded that the extension and stricter procedures about the testing that already interfered with clinical duties was implemented without communication was retaliatory. [Doc. 186-11 at 1]

Despite Kavianpour's requests, Norton and Arnold never met with her. [Doc. 189 at 227:16-228:1; Doc. 186 at 89:20-22, 90:21-23].

Dr. Macomson failed to respond to her 2019.02.01 email asking to meet and discuss HR's emails. [Doc. 230-3 at 11-12 ¶¶45-47; Doc.178-14 at 1; Doc. 192 at 120:9-122:4]

On 2019.02.03, Norton forwarded Kavianpour's email that questioned the legality of Norton's actions to AU Legal, Greg Bryan, and AUMC Legal, Clark Speese, asking for discussion. [Doc. 194 at 176:18-179:15; Doc. 186-11]

On 2019.02.07, Dr. Moore emailed Greg Bryan a counseling form for a resident they recently discussed with HR. [Doc. 186-16] Greg Bryan recommended "flesh[ing] out" issues like "argumentative behavior" as he "sense[d] that [they

were] headed for a rough time with this resident," which Bryan admitted was due to Dr. Kavianpour's "objections to this, that, and the other thing," including the drug testing they implemented to "prove that she was not using." [Doc. 186-16; Doc. 201 at 96:7-99:7]

On 2019.02.11, Neurosurgery officials, Drs. Macomson and Rahimi, met with Dr. Kavianpour to give Dr. Kavianpour the counseling papers, [Doc. 230-3 at 11-12 ¶¶45-49 (signature acknowledged receipt)] providing "Verbal Counseling 1st Occurrence," and "Resident Remediation Plan." [Doc. 192-17; Doc. 192 at 62:13-16, 60:11-61:4]. Dr. Macomson admitted that the initialed areas were boilerplate, not areas of criticism. [*Id*. at 63:7-64:2] The other alleged areas of potential concern are disputed. [Doc. 208-1 at 67-83 ¶¶37-39]

Contrary to Arnold's January 31 memo indicating Arnold would contact Kavianpour's "Program Director or designee" to "determine … if clinic responsibilities would interfere with your ability to arrive timely," [Doc. 186-11 at 2] on the test day for 2019.02.13, Arnold emailed purported "designee," Coordinator Jones, but did not discuss patient coverage. [Doc. 208-7 at 1] Ms. Jones, the purported "designee," [Doc. 230-1 at 128 ¶124; Doc. 178-20 at 1] admitted that "[t]here was not a designated person," to help her get patient coverage for Dr. Kavianpour. [Doc. 178-12 at 230:15-231:20] Dr. Macomson did not have notice or provide patient coverage. [Doc. 192 at 94:2-17] Dr. Kavianpour tried to comply with

9

HR's demand by attempting transition of care to Dr. Sparks, who refused. [Doc. 178-12 at 86:12-87:5; Doc. 192 at 115:17-117:21].

Under HS 10.0 §6.5 and HS 24.0 §6.7, Dr. Kavianpour was contractually obligated not to abandon patients and transition care to another provider before leaving the hospital. [Doc. 228-24 at 21 & 63; Doc. 190 at 26:12-31:16; Doc. 230-3 at 3 ¶12] Under HS 10.0 §15.1(6), BOR was required to have patient care coverage procedures in place, [Doc. 228-24 at 28] but did not, which Dr. Macomson admitted. [Doc. 192 at 98:3-8; Doc. 178-1 at 60:7-21, 78:19-79:2]

On the morning of 2019.02.14, Arnold directed Employee Health not to test Dr. Kavianpour even though she presented to test. [Doc. 186 at 124:24-125:3; Doc. 186-21; Doc. 192 at 115:17-117:21]. Later that day, Dr. Vale, the Neurosurgery Chair, offered a solution to take the on-call pager for future drug tests. [Doc. 178-12 at 204:9-17; Doc. 197 at 80:1-5].

Norton was aware of the Dr. Vale's solution between February 14 and 21, 2019. [Doc. 194 at 290:1-4, 293:22-296:11.]

Dr. Vale testified that no patient safety concern or incident arose to justify shortening Kavianpour's three-month remediation period to which she was entitled. [Doc. 197 at 169:16-170:8]. "The only incident that [Dr. Macomson was] aware of that happened after this [counseling] form was signed was her not appearing within

10

a time frame that Human Resources told her she needed to for a drug test." [Doc. 192 at 65:10-66:9].

On 2019.02.21, BOR simultaneously issued AUMC suspension and termination letters to Dr. Kavianpour, and then Neurosurgery told Kavianpour that HR was responsible. [Doc. 230-3 at 15-16 ¶¶60-62; Doc. 192-3; Doc. 192-4] Norton or Arnold decided that the AUMC suspension required termination, [Doc. 178-1 (30(b)(6)) at 117:3-118:2] and a grievance to be filed with HR, [Doc. 208-10 at 11; Doc. 192-4] rather than provide the contractually required GME process. [Doc. 3-2; Doc. 193 (30(b)(6)) at 84:10-85:8] Dr. Kavianpour's requests for a GME hearing were ignored. [Doc. 208-8; Doc. 228-21; Doc. 216 at 8 ¶¶40-42] Melcher's March 14 email describes appeal rights, [Doc. 187-13] but Defendants withheld notice of a separate appeal right for the suspension. [Doc. 195 at 53:14-54:5, 55:7-56:25, 62:3-9]

**HR hearing**

At the March 2019 hearing, Dr. Macomson testified that "If Dr. Kavianpour had complied with the testing requirements, then no adverse action would have been taken." [Doc. 178-12 at 247:24-248:15] Dr. Coule and Dr. Macomson admitted that without the alleged failure to appear for a drug test on 2019.02.13, Dr. Kavianpour would not have been suspended or terminated. [Doc. 187-9 at 174:11-175:5; Doc. 192 at 172:10-19]

11

HR's panel upheld termination based on "passive unwillingness" and the falsity that the testing was "a condition of hire." [Doc. 186-7; Doc. 194 at 190:4-192:4, 267:6-7, 267:23-268:2].

**Dr. Kavianpour's residency performance**

Dr. Kavianpour was clinically active, participating in life-saving procedures, with and eventually without direct supervision, working full-time from July 2018 through 2019.02.21. [Doc. 216 at 2; Doc. 192 at 54:17-22] Dr. Kavianpour only received positive feedback from supervising chief residents [Doc. 207-54 at 77], and was scheduled for the most overnight in-house neurosurgery call alone in March 2019. [Doc. 228-8]

**Sham 2020 GME process**

On 2019.12.16, BOR unilaterally reinstated Kavianpour without a contract or return to clinical training [Doc. 192-25; Doc. 178-1 (30(b)(6)) at 37:10-22; Doc. 190 at 216:1-7], attempting to cure its previous failure at due process and the denied GME hearing, by holding second process with a predetermined outcome of " termination," as shown in Coordinator Jones email. [Doc. 192-26]

USG instructed AU to reinstate and provide a GME process for the suspension by Coule [Doc. 178-16 at 1-2; Doc. 194 at 226:23-229:20]. Instead, the January 2020 Clinical Competency Committee (CCC) recommended nonrenewal [Doc.

201-43 at 3-4].[6] The reinstatement letter falsely represented that the process would review the suspension [Doc. 192-25], but the CCC did not review the suspension [Doc. 197 at 185:11-14]. No appeal has ever been provided for the suspension.

**Defendants' ACGME Citation**

On 2021.12.03, the ACGME issued a Citation of substantial noncompliance to Defendants' Designated Institutional Official (DIO): "The information submitted [by the DIO][7] does not document institutional assurance that Dr. Sarah Kavianpour received a timely written notice of intent … not to be renewed. Information concerning the remediation provided to Dr. Kavianpour does not substantially document compliance…" [Doc. 171-2 at 2-3; Doc. 178-1 at 130:1-7; 130:22-131:16]

BOR's 30(b)(6) witness testified, "ACGME has determined that the neurosurgery department had violated House Staff Policy 18.0 relative to how Dr. Kavianpour was dismissed originally and/or dismissed again at the reinstatement." [Doc. 178-1 at 130:1-7, 130:22-131:16]. HS 18.0, which "outlines a procedure for monitoring resident performance and remediating it," governs the process for notice and opportunity to cure deficiencies. [Doc. 192 at 57:1-15; Doc. 178-1 (30(b)(6)) at 42:4-11; Doc. 197 at 27:13-17].

---

[6]    Kavianpour was not provided meaningful notice and was advised not to attend. [Doc. 216 at 9-11¶¶45-53]

[7]    Defendants' DIO Drs. Hocker and Savage provided HS Policy 18.0 and 13.0 and other documents to ACGME for investigation. [Doc 196-1; Doc. 171-6]

BOR's 30(b)(6) witness testified that the DIO and the Neurosurgery Residency Program must comply with ACGME requirements, including to correct citations of substantial noncompliance. [Doc. 178-1 at 126:1-127:9, 128:3-129:2, 132:20-24]. However, in June 2022, Dr. Savage testified Appellees would not take corrective actions relative to Dr. Kavianpour. [Doc. 221 at 91:12-93:1, 96:21-97:12, 124:3-23, 227:6-13]

## STANDARD OF REVIEW

Review of the dismissed claims is de novo. *BioHealth Med. Lab., Inc. v. Cigna Health & Life Ins. Co.*, 706 F. App'x 521, 523 (11th Cir. 2017). "[W]ell-pleaded factual allegations in the complaint must be taken as true and the complaint must be construed in the light most favorable to the plaintiff." *Id.* (citation omitted) "[A] complaint must only contain enough facts that a claim for relief is plausible on its face." *Id.* (citation omitted).

Review of summary judgment is de novo. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010) (citation omitted). Summary judgment is upheld "if, after construing the evidence in a light most favorable to the non-moving party, we find that no genuine issue of material fact exists . . . ." *Id.* at 1263-64 (citations omitted).

**SUMMARY OF ARGUMENT**

This case is between a medical resident covered by the protections of the American College of Graduate Medical Education (ACGME) and the Sponsoring Institution, comprised of Augusta University Medical Center (AUMC), a teaching hospital's administrative and business managers, and the Board of Regents (BOR), with its teaching medical faculty, which train and evaluate the residents in this federally funded residency educational program, that must be administered in a manner that protects patient safety. [Doc. 204-8] The trial court erroneously treated ACGME resident Kavianpour as an at-will employee, not protected by HS 10, and other ACGME policies.  [Doc. 269 p. 41-43.]  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (deviation from required practice supports a pretext finding); *see infra* §VI (C) (3).

AUMC regarded Dr. Kavianpour as having a substance abuse disorder that threatened patient safety. [Doc. 177-2 (Coule Dep.) at 99:12-100:2] The District Court erred in finding summary judgment as to AUMC, by failing to require objective evidence under the ADAAA's direct threat provision, when a merely subjective belief in a safety threat due to a disability is a discriminatory reason. *Lewis v. City of Union City*, 934 F.3d 1169, 1182 (11th Cir. 2019). The same standard applies to its finding under the Rehabilitation Act as to BOR.

Pretext for the termination is shown by testimony that Drs. Vale and Macomson were not really the decisionmakers and were initially going to retain Dr. Kavianpour. [Doc. 197 at 120 & 139:2-17] They were forced to terminate when BOR HR and attorneys intentionally misrepresented that Dr. Coule's temporary suspension on behalf of AUMC was irrevocable. [Doc. 207-41 at 10-11& 14; *see infra* §VI (C)]. BOR also abruptly fired compliance officer John Lott when he issued a report finding that BOR had discriminated and retaliated against Dr. Kavianpour. [Doc. 209-8 at 2, 4-18, 21-23 ¶¶6, 8, 12-75, 88-98].

The ACGME issued a citation to BOR-AUMC that policies had not been followed for the suspension-termination of Kavianpour that would require reinstatement. [Doc. 171-2 at 2-3] When Dr. Savage, the ACGME Designated Institutional Official was deposed she asserted that no corrective action would be taken. [Doc. 221 at 91:12-93:1]

## ARGUMENT AND CITATION OF AUTHORITIES

## I.    The drug testing of Dr. Kavianpour violated the Fourth Amendment.

The Court erred by dismissing the Fourth Amendment claim against Arnold and Norton for the repeated drug testing, finding no constitutional violation and granting qualified immunity. [Doc. 69 at 35-41] Count XIV, challenged the "monthly drug testing" that was unilaterally imposed on Dr. Kavianpour in the

August 21, 2018 Notice, and was to continue "until July 31, 2019," per the "Random Drug Testing" policy. [Doc. 29 ¶¶30-35]

When the 'special needs' exception to the Fourth Amendment applies, suspicionless drug testing is only allowed if authorized by a uniform selection process in accordance with generally applicable policies, laws, or regulations. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 663-66 (1989); *Benavidez v. City of Albuquerque*, 101 F.3d 620, 624 (10th Cir. 1996); *Ford v. Dowd*, 931 F.2d 1286, 1291-92 (8th Cir. 1991) (challenged drug test "shows no respect for the safeguards present in *Von Raab*, … : Ford was not selected for urinalysis testing according to a random or routine program which guarded against discriminatory or arbitrary selection of employees to be tested."); *Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 171-72 (2d Cir. 1998) (similar)

## A.    The testing was not random nor from a uniform selection process.

The 'random' drug testing program targeted only Kavianpour every month [Doc. 29 ¶¶30-35, 65, 112-113, 169, 179, 189, 231, 295]. Others were not being tested [*id.* ¶¶121, 210], Dr. Kavianpour was "selectively targeted" despite policy requiring "anonymous" selection. [*Id.* at 37 ¶179]

Contrary to the Court's finding, AU Policy 685 cannot justify the testing scheme. [Doc. 69 at 41, n. 8; Doc. 61 at 110-111] Arnold admitted to violating AU's

17

Random Drug Testing Policy, and BOR's investigation determined that AU and Georgia's Random Drug Testing Policy were not adhered to. [Doc. 29 at 23-24 ¶¶112-3] Arnold and Norton violated O.C.G.A. §§ 45–20–90 through 93, "Random Drug Testing of Employees in High-Risk Jobs."[8] The "Random Drug Testing" section of AU policy 685 used to justify the monthly testing [Doc. 29 ¶¶30-32 (provided link broken – see Doc. 194-8)] requires the testing be "in accordance with applicable laws and regulations." [Doc. 194-8 at 4][9]

Finally, the Complaint has no allegations indicating that Defendants were pursuing "For Cause" drug testing, or that any of the monthly drug tests or searches of Plaintiff were based on individualized suspicion. [Doc. 29; *see* Doc. 194-8 at 3-4 ('For Cause' section of AU Substance Abuse Policy 685); *see infra* § B].

**B.      There was no reasonable suspicion for the challenged tests.**

There was no objectively reasonable basis to suspect that Dr. Kavianpour was using an illicit substance when the year-long drug testing was imposed in August

---

[8]      Contrary to the Court's findings about SMSPA [Doc. 69 at 16], the State Personnel Board for Random Drug testing (Ga. Comp. R. & Regs. r. 478-1.21C "Random Substance Abuse Testing for High-Risk Positions") applies under O.C.G.A. § 45-20-92. [*See* Doc. 188 at 13:6-11 (BOR 30(b)(6) admitted it applies)]

[9]      The Complaint alleges the 'special needs' or 'high-risk positions' policies and laws were violated–not that Kavianpour is not in the special needs category. Complaint allegations [Doc. 29 at 35 ¶¶168-169] were about Ga. Comp. R. & Regs. r. 478-1.21C "Random Substance Abuse Testing for High-Risk Positions" and the USG policy was for "High Risk" positions. [Doc. 29 at 34-35 ¶¶166-168 (provided link broken–see Doc. 194-11)] *See* discussion in Doc. 48 at 2-6, 20.

18

2018, nor before any of the subsequent tests. The District Court's contrived reasons

for the drug testing [Doc. 69 at 40] do not provide an objective basis. The first reason,

the sensitive nature of Dr Kavianpour's work, is not individualized. [*Id.*]

Second, the law treats Dr. Kavianpour's first pre-employment test that did not

have a split sample as "Canceled" under O.C.G.A. §§ 45-20-110 through 45-20-111

("DRUG TESTING FOR STATE EMPLOYMENT"), as cited in [Doc. 29 ¶¶187-

189].[10] Dr. Kavianpour's re-test was negative and she was therefore hired. [*Id.* ¶¶27-

28] Appellees could not lawfully treat the first pre-employment canceled test as a

basis for reasonable suspicion.

The other reasons occurred subsequent to the imposition of the year-long drug

testing program, and therefore cannot retroactively provide a reasonable basis for its

imposition.

Third and fourth, the Court erroneously concluded that "Defendants

apparently believed" "rumors'' that she had previously used marijuana for her stress

and was seen crying at work. [Doc. 69 at 23, 40]. Dr. Kavianpour denied the rumors.

[Doc. 29 ¶37] If Appellees believed the rumors, they should have removed her from

---

[10]    Under O.C.G.A. § 45-20-110, "(2) Established test" means the collection and testing of bodily fluids administered in a manner equivalent to that required by the Mandatory Guidelines for Federal Workplace Drug Testing Programs (HHS Regulations 53 Fed. Reg. 11979, et seq., as amended)." *See* Section 2.3 of Subpart B (Each urine specimen is collected as a split specimen); Section 14.1(c) of Subpart N (split not available test must be canceled and recollection) of 82 Fed. Reg. 7920-68 (Jan. 23, 2017).

patient care and tested her then under a 'For Cause' basis, which they did not do. Fifth, the DUI arrest of Dr. Kavianpour [Doc. 69 at 40] by reasonable inference was alcohol related, and Dr. Kavianpour was not removed from patient care. Dr. Coule testified "other providers with DUIs were neither suspended nor terminated." [Doc. 29 ¶101]

Sixth, the "repeatedly missed" drug tests [Doc. 69 at 40], were due to erroneous off-duty testing requests by HR, and the January 31, 2019 HR "letter conceded that Plaintiff would not be subject to testing on her days off." [Doc. 29 ¶64] There was also a dilute finding on an initial test on October 17, 2018, requiring a retest on October 19, 2019, that was negative, where the dilute finding was attributed to a kidney condition requiring overhydration. [*Id.* ¶¶44-47]

### C.    Qualified immunity should be denied.

Qualified immunity should be denied to Arnold and Norton because there is "a broader, clearly established principle [that] should control the novel facts [of the] situation." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citation omitted) The principle, that suspicionless special needs testing violates the Fourth Amendment if is not pursuant to uniform policies, clearly applies to the challenged testing. *See Von Raab,* 489 U.S. at 663-66; *Benavidez*, 101 F.3d at 624. The tests were obviously not random nor pursuant to other uniform policy, *see supra* § A, nor was there any objective basis to suspect drug use, *see supra* § B.

The obviousness of the Fourth Amendment violation is also established by Appellees' violation of state law and regulations for drug testing. [O.C.G.A. §§ 45–20–90 through 93 (random drug testing); Doc. 193-14 (Ga. Comp. R. & Regs. r. 478-1.21C, same)]. In *Hope v. Pelzer*, the Court found an obvious violation in part by relying on an applicable regulation the officials violated. 536 U.S. 730, 741 (2002).

## II.    The Complaint properly states a procedural due process violation for the termination.

The Complaint alleged due process violations in Kavianpour's suspension from hospital access *and* in her termination from the residency program. Because the suspension and termination occurred simultaneously the facts for both violations are intertwined and encompass both claims. [*See* Doc. 29 at 56 Count XV; *id.* at 59 ¶¶309-310 (expectation of continued residency, and denial of process for termination); *id.* at 60-61 ¶¶313-316 (lack of process for termination)]

The Court erred by construing the claim as being limited to the suspension. [Doc. 69 at 42] The Court rejected the suspension claim for lack of a property interest [*id.*], but did not address the termination claim, as to which the protected property interest was undisputed as held by the Magistrate Judge [Doc. 61 at 119 & n.58][11]

---

[11]    In response to Arnold and Norton's motions to dismiss, Dr. Kavianpour argued she had a protected property interest in continuing in her residency [Doc.

Contrary to the District Court's finding, Plaintiff objected and demonstrated that she was "constitutionally entitled to more process than she received," [Doc. 69 at 42] due to her objections to Appellees' violations of contractual HS 13.0, which covers discipline and appeals [Doc. 64 at 37-38].

Dr. Kavianpour was denied any pre-termination process, because the basis for the termination, Dr. Coule's suspension of hospital access, was issued simultaneously with the termination. [Doc. 29 at 18 ¶¶83-4] This was a violation of her right to know and contest the reason for the termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985)

The post-termination process was a sham in violation of due process. *Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 761-62 (7th Cir. 1999); *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) The suspension was the purported basis for the termination, but at the March termination hearing BOR asserted that it could not overturn the suspension, meaning that it had to uphold the termination. [Doc. 29 at 60-61 ¶¶316-17] "Plaintiff has yet to receive any process for the suspension of her clinical privileges by Defendant Coule." [Doc. 29 at 59-61 ¶¶311-2, 317].

---

48 at 24-25], and that qualified immunity should be denied for failing to allow an appeal of the suspension and termination of her employment. [*Id.* at 10-11] In her objections to the Magistrate Judge's R&R she argued that they were state actors when denying her process for the termination. [Doc. 64 at 29-32]

22

Similarly, Dr. Coule's summary judgement motion was denied for allegedly depriving Dr. Street of due process when he conducted no investigation before summarily suspending her. *Street v. AU Health Sys. Inc. & Coule*, No. 2021ECV0266, at 3-6 (Ga. Super. Ct. Columbia Cnty. June 6, 2024).

Contrary to the District Court's finding that any due process violations were cured by Dr. Kavianpour's reinstatement in December 2019 [Doc. 69 at 42 (referring to the Magistrate Judge opinion at 119-120 n.58)] the subsequent process in January and April of 2020 was futile. First, Dr. Kavianpour objected to the speculation of future actions not pleaded in the Complaint. [Doc. 64 at 37 ("Plaintiff's hearing was continued at the time of the filing of the Amended Complaint …"] Second, BOR provided a "GME hearing on an undisclosed topic" [Doc. 29 at 29 ¶135]. Although it was purported to be an appeal for the 2019 suspension-termination, [*Id.* ¶136] BOR took different disciplinary action by issuing a non-renewal of contract based on alleged issues that were not previously raised. [*Id.* at 29-30, 64-64 ¶¶138-139, 333]. Dr. Kavianpour was again denied meaningful notice and an opportunity to respond in violation of due process.

In addition to Arnold and Norton, Dr. Coule is liable for the due process violation. The Court erroneously found that Dr. Coule was not a state actor. [Doc.69 at 42 & n.9; citing M.J. Op. Doc. 61 at 107-108] First, Dr. Coule was alleged to be a dual agent for AUMC and BOR [Doc. 29 at 56 ¶301, 58 ¶304], as proven by his

23

dual job titles "Interim Vice-President and CMO, Augusta University Medical Center" and "Interim Associate Dean for Clinical Affairs, Medical College of Georgia." [Doc. 33-3 at 2 (In bold at the bottom of Dr. Coule's suspension letter)] Color of law is not defeated merely because someone works "in dual capacities." *Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 552-53 (5th Cir. 1988*)*; *West v. Atkins*, 487 U.S. 42, 56 (1988).

Second, Dr. Coule worked jointly with state employees Arnold and Norton to issue the suspension-termination simultaneously. [Doc. 29 at 18 ¶¶81-85] Private parties act "under color of law" if they conspire with or jointly engage with a state official. *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). Dr. Coule was previously found to be a state actor when he coordinated with BOR officials on another simultaneous suspension-termination. *Williams v. Bd. of Regents*, No. CV 120-100, 2022 U.S. Dist. LEXIS 177575, at *13-14 (S.D. Ga. Sep. 29, 2022).

III.    **The Complaint properly alleges that the suspension-termination was a breach of contractual requirements in HS 13.0.**

Although the District Court found that Appellees violated HS 13.0 by not providing GME process, the breach claim was dismissed erroneously for lack of damages. [Doc. 69 at 17-20] The Court erroneously reasoned that the sham reinstatement process complied with HS 13.0 in reaching the same decision, non-renewal. [*Id.* at 19]

24

First if BOR had complied with HS 13.0 she would not have been terminated. HS 13.0 required the decision to be made by her supervisors Drs. Vale and Macomson. But the termination decision "did not come from the Department" and was "HR-driven and out of [the Program Director's] control," who wanted her to return to work. [Doc. 29 at 18 ¶¶81-85] Her supervisors claimed to be "powerless to overturn an AUMC decision" [Doc. 29 ¶¶88, 313, 316]; however, they had the authority over discipline and reversal under HS 13.0.[12] Dr. Kavianpour had no performance issues [Doc. 29 ¶¶207, 310, 331], and the Neurosurgery Department wanted her to return to work in March 2019 [Doc. 29 ¶¶70, 85, 88, 95, 100, 313], so she would have finished her first year and received at least a second-year residency contract, had HS 13.0 been followed.

Second, if HS 13.0 had been followed, then Dr. Kavianpour could not have been terminated in February 2019 and would have finished her first year of residency. A non-renewal must occur at least four months before the end of the current contract period. [Doc. 228-24 at 5 (HS 3.0); *Id.* at 36 (2.2.1 of HS 13.0)] Plaintiff was not permitted to finish her first-year, and thereby was not "eligible to

---

[12]     The "[p]urpose" of HS 13.0 is to "define the procedure for Residency Program officials to … make recommendations regarding disciplinary actions taken against House Officers that could result in [d]ismissal …or [o]ther actions that could significantly threaten a House Officers interned career development" [Doc. 228-24 at 36].

obtain her own medical license and work independently or as a contract physician." [Doc. 29 at 33 ¶160]

Third, HS. 13.0 was not followed with respect to her reinstatement and non-renewal. The District Court erroneously assumed the 2020 process was "in accordance with" HS 13.0. [Doc. 61 at 138; Doc. 69 at 18-10; Doc. 90 at 8] The Complaint does not allege that HS 13.0 was actually followed, only that notices were provided purporting to follow HS 13.0. [Doc. 29 at 29-31 ¶¶136-144] The process was still "pending," at the time the Amended Complaint was filed, [Doc. 29 at 30-31 ¶144] so there was no basis for the District Court's finding that HS 13.0 was followed in subsequent steps. Moreover, based on HS 13.0, a non-renewal of contract would have allowed Plaintiff to finish residency year-one. [Doc. 228-24 at 5 (HS 3.0); *Id.* at 36 (2.2.1 of HS 13.0)] BOR breached this requirement, because during the reinstatement period "her suspension would remain in effect and she would not be able to enter AUMC premises." [Doc. 29 at 29 ¶137]

Fourth, after the reinstatement BOR took a different disciplinary action by issuing a non-renewal of contract based on alleged issues that were neither previously raised nor provided an opportunity to correct. [*Id.* at 29-30, 64-64 ¶¶138-139, 333] This action was taken either for a contract that did not exist [Doc. 29 at 30 ¶141] or for the previous contract that did not permit a non-renewal decision without

a remediation period of "at least three months" pursuant to HS 18.0. [Doc. 228-24 at 44-45]

Finally, AUMC is also liable for breach of HS 13.0. The District Court erroneously found that AUMC was not a party to the employment contract. [Doc. 69 at 16-17] "[A] court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless." *Am. Acad. of Gen. Physicians, Inc. v. LaPlante*, 340 Ga. App. 527, 531 (Ga. Ct. App. 2017) (citation omitted) The contract specifies that one of the terms of Dr. Kavianpour's employment was her ability to work at an AUMC hospital site. [Doc. 3-2 at 2] Leaving AUMC out of the contract would render that term and condition meaningless. Moreover, AUMC is part of the Sponsoring Institution for the Residency Program, and has signed affiliation agreements between AUMC and BOR, AUMC has a duty to adhere to ACGME requirements. [Doc. 29 at 2-4 ¶¶1, 4]

## IV.  AUMC's suspension of Dr. Kavianpour was regarded-as discrimination.

The Court erroneously granted summary judgment on the claim that Dr. Coule, AUMC's Chief Medical Officer, unlawfully suspended her because he regarded her as having a substance abuse disorder that presented a threat to patient safety. [Doc. 29 Compl. Count 8] The only disputed issue is discriminatory causation: the District Court does not dispute that Dr. Coule regarded Dr. Kavianpour as having a "substance abuse disorder" or impairment "at the time [he]

suspended [her] privileges.'" [Doc. 177-2 (Coule Dep.) at 37-38; Doc. 269 at 44-45 (assuming Plaintiff established a prima facie case)]. The Court did not address AUMC's asserted current drug use exception, 42 U.S.C. § 12114(a)-(b), nor their asserted direct threat defense.[13]

Dr. Coule's statements show that he regarded Plaintiff as having a substance abuse disorder that threatened patient safety requiring suspension, so this case is straightforward. A safety threat due to a disability is a discriminatory reason. *Accord Lewis v. City of Union City*, 934 F.3d 1169, 1182 (11th Cir. 2019) ("an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled"); *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001) (a "good-faith and honest belief that [the employee] posed a direct threat" is not a "legitimate, non-discriminatory reason").

The Court erred by misconstruing Dr. Coule's testimony, finding that (A) Dr. Coule referred to mere drug use not rising to the level of an impairment [Doc. 269 at 45 & 51-52 n.22], and (B) that the totality of the circumstances of Plaintiff's conduct indicated substance abuse *or* bad judgment, namely the allegedly failed drug

---

[13]    The Magistrate recognized "a dispute of fact as to whether she remained a current drug user … at [suspension/termination]." [R&R Doc. 254 at 113] The Magistrate did not resolve the direct-threat defense. [*Id.* at 128 n.75] Defendants did not object to these two issues. "The Court adopts the limited portions of the R&R to which no party specifically objects [except the employment relationship section]." [Doc. 269 at 15 n. 7]

test, an allegedly missed drug test, and a DUI arrest; and that Dr. Coule stated that any of those circumstances on their own justified the suspension. [*Id.*]

### A. As opposed to mere or current drug use, Dr. Coule refers to a substance abuse disorder as a reason for the suspension.

The Court erroneously weighed the evidence finding that Dr. Coule's statements were about "mere [drug] use [] not addiction" motivating the suspension. [Doc. 269 at 45-46 & 51-52 n.22] Dr. Coule never used the term drug use, and instead used three terms: "substance abuse disorder" (2 times) [Doc. 177-2 at 37:25-38:7, 99:12-100:2], "substance abuse problem" (4 times) [*Id.* at 38:15-39:2, 60:11-22, 99:12-100:2, 147:21-148:25] and "substance abuse" (6 times). [*Id.* at 58:17-59:21, 60:1-4, 88:4-23; Doc. 178-12 (March 2019  testimony) 155:9-11, 161:14-17, 161:23] When Dr. Coule was asked whether he believed that, at the time of the suspension, Dr. Kavianpour had a "substance abuse *problem*," he said it was a "substance abuse *disorder*." [Doc. 177-2 (Coule Dep.) at 37-38 (emphasis added)].

Dr. Coule's references to a "substance abuse problem" and "substance abuse" are reasonably construed as synonymous and interchangeable with his references to a "substance abuse disorder." *See* e.g. *Lowe v. Pettway*, No. 2:20-cv-01806-MHH, 2023 U.S. Dist. LEXIS 53302, at \*10-14, 33-43 (N.D. Ala. Mar. 28, 2023) (referring synonymously to "substance abuse disorder," "substance abuse problem,"

29

"substance abuse issue," and "substance abuse" denying summary judgment ADA claims).

Dr. Coule also explicitly refers to the substance abuse problem as showing an impairment, that she was an "impaired physician." The Court erred by relying on Dr. Coule's general definition of the term "impaired," to be about "perform[ing] to the best of their abilities" for any reason. [Doc. 269 at 52 n. 22] Dr. Coule defines it that way, but then immediately clarifies and repeatedly *applies the term,* "an impaired physician" *to Plaintiff as meaning* Plaintiff "potentially had a substance abuse problem—that—that could potentially endanger patient safety." [Doc. 177-2 at 60:11-22, 147:21-148:24 ("I was using that term [impaired physician] in the greater context of could be suffering from a substance -- or, excuse me -- or have a substance abuse problem that could contribute to a patient safety concern.")].

The Court [Doc. 269 at 46] erroneously relies on *Jones v. City of Boston*, 752 F.3d 38, 58-59 (1st Cir. 2014), where the employer imposed adverse actions because plaintiffs had just tested positive, and there was zero other evidence that they were regarded as having a substance abuse impairment. *Id*. at 58-59 & 41. But here, evidence is abundant, including Dr. Coule's statements and the following facts:

(1) The challenged hearsay in meeting notes that Dr. Kavianpour said she had a chronic, daily problem with marijuana in medical school [Doc. 203-24 (Horne 7/29/2019 interview notes of Dr. Coule); Doc. 203 (Horne Dep.) at 190:16-191:16,

30

261:23-264:18 (confirming his notes)]; (2) the DUI arrest which Dr. Coule stereotyped as being evidence of repeatedly driving impaired [Doc. 178-12 at 161:5-10]; (3) that AUMC subjected Dr. Kavianpour to a year-long monitoring program for a substance abuse problem after initially testing positive [Doc. 177-2 (Coule Dep.) at 140:20-141:1; *id.* at 37 (a "monitoring program" is for those with a "substance abuse problem")]; and (4) that she had 'missed' her last drug test. [*Id*. at 37:25-38:7]

Whether construed as direct or indirect evidence, Dr. Coule's testimony establishes a jury issue. It constitutes direct evidence of the discriminatory suspension. *See Jordan v. City of Union City, Ga*., 94 F. Supp. 3d 1328, 1338 fn. 3 (N.D. Ga. 2015), *aff'd on other grounds*, 646 F. App'x 736 (11th Cir. 2016) ("The undisputed evidence shows [the decisionmaker] considered Plaintiff's anxiety condition when terminating him. At this step in the analysis, [the decisionmaker's] verbalization of that consideration equates to direct evidence of discriminatory attitude."). Alternatively, it is indirect or pretext evidence that also creates a jury issue. "A plaintiff can establish pretext … 'directly, by showing that the defendant was more likely motivated by [unlawful] animus than by its proffered reasons.'" *Luckey v. Fulton Cty.*, No. 1:05-CV-714-RWS-AJB, 2006 U.S. Dist. LEXIS 110807, at *26-27 (N.D. Ga. July 12, 2006) (citations omitted); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362-63 (11th Cir. 1999)

31

(decisionmaker's biased statement related to adverse action was "probative as to whether [unlawful] animus motivated the decision").

### B.    Plaintiff's conduct was not an independent nor legitimate reason.

The alleged threat to patient safety due to a substance abuse disorder was a significant but-for cause of the suspension, and there are no legitimate reasons that were sufficient to motivate the suspension on their own. To the extent the Court found that the suspension was for misconduct, Dr. Coule had no authority to discipline residents for misconduct. AUMC repeatedly emphasized that the suspension was "a necessary emergency measure designed to ensure patient safety." [AUMC's Br. Doc. 199-1 at 14; *id* at 29 (similar)] "The residency program, not the Chief Medical Officer ("CMO") of the hospital, was responsible for disciplinary actions related to residents." [AUMC's SOMF (Doc. 199-2) p.4, ¶9 (citing Coule Dep. 91:12-92:5)]

First, the asserted reasons were not separate, independent or legitimate, and instead were merely part of Dr. Coule's explanation for why he concluded that Kavianpour had a substance abuse disorder. As to the initial test, DUI, and non-compliance with the drug testing, [Doc. 187-9 (March 2019 Tr.) at 155:2-17] those are the exact same reasons Dr. Coule testified she has a substance use disorder: "I believed that Sarah Kavianpour could potentially have a substance abuse disorder, as evidenced by her positive drug test, her DUI arrest, as well as her failing to appear

32

for substance abuse testing as scheduled." [Doc. 177-2 (Coule Dep.) at 37:25-38:7] In *Henson v. City of Atlanta*, the Court recognized that evidence the plaintiff "failed to comply with [the required psychological counseling]" was evidence that he was regarded as having a mental impairment. No. 1:17- cv-03024- JPB-RGV, 2019 U.S. Dist. LEXIS 238612, at *31 (N.D. Ga. June 18, 2019).

Nor do the initial positive test and DUI charge justify a suspension on their own: she was hired after a negative re-test and allowed to work without being drug tested for approximately 10 weeks. [Doc. 230-3 at p. 5 ¶22 (first drug test on Sept. 17, 2018); Doc. 208-6 at 2 ¶1 (hired on "07/10/2018")]) Indeed Dr. Coule learned of the initial positive pre-employment finding by October 2018 and did not inquire further or issue a suspension. [Doc. 177-2 at 30:15-21, 35:16-36:2, 86:1-87:15; Doc. 187-10 (October emails); Doc. 203-24 (Horne interview notes of Coule)]. As to the DUI, Dr. Coule testified that DUI arrests are not routinely reported to him as a matter of patient safety [Doc. 177-2 at 65:22-66:4] and testified that resident physicians are not suspended for DUI arrests. [Doc. 187-9 at 175:6-176:14]

Second, the Court erred by adopting AUMC's statement in its brief that "*any of [those things] raised a concern for patient safety*" [Doc. 269 at 45 (emphasis in original, citations omitted)] so as to justify the suspension. That was not Dr. Coule's testimony: he testified that "*the totality of the information was sufficient* to cause

33

concern for patient safety," [Doc. 177-2 at 84:4-10 (emphasis added)] not "any" one factor.

**V.      BOR is liable under respondeat superior for Dr. Coule's suspension.**

The Court erred by finding that Dr. Kavianpour failed to adequately raise that Dr. Coule was BOR's agent for the suspension. [Doc. 269 at 35] Dr. Kavianpour raised it separately in a section of a brief that clearly identified the issue. [Doc. 230 at 23-24 (§i)] She presented the relevant facts, that Dr. Coule was a BOR employee acting pursuant to his official BOR job duties concerning the suspension, and the controlling legal rule, that agency principles apply to the ADA[14] and provide that when an employee is "'acting in the scope of [his] employment'" – the employer is liable. [Doc. 230 at 24 (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 755-56 (1998)] That was all it took "'to afford the district court an opportunity to recognize and rule'" on this issue. *Mercer v. Mitchell*, 908 F.2d 763, 767 n.7 (11th Cir. 1990) (citation omitted).

The official job description of Dr. Coule, as a BOR employee, includes joint duties for the "the Medical College of Georgia" to "work collaboratively across the enterprise entities" [Doc. 228-10 at 1] and specifically includes working "[i]n conjunction with [BOR HR's Susan Norton]" for the "identification and

---

[14]     Agency principles also apply to Rehabilitation Act. *Bowen v. Rubin*, 385 F. Supp. 2d 168, 180 (E.D.N.Y. 2005).

management of impaired physicians" including alleged "drug abuse." [*Id*. at 5] This job duty squarely encompasses Dr. Coule's suspension of Dr. Kavianpour as an allegedly impaired physician while working in conjunction with Susan Norton and BOR HR. [*See* Pl.'s Resp. to S.J. (Doc. 230) at 24 (showing the coordination of BOR HR's "February 21st memorandum [to Dr. Coule] that led to the suspension"); *id*. at 12-13 (detailing the February 21, 2019, memo causing the suspension)]. In sum, Dr. Coule was a dual agent of BOR and AUMC. [15]"A person may be the servant of two masters … at one time as to one act … ." Restat. 2d of Agency, § 226. *See Jackson v. W. Va. Univ. Hosps., Inc.*, 1:10CV107, 2011 U.S. Dist. LEXIS 42428, at *8-9 (N.D.W. Va. Apr. 19, 2011) (finding that two defendants in charge of a university hospital were each liable for the unlawful acts of the plaintiff's supervisor, who was a dual agent).

## VI.    The termination by BOR was regarded-as-disabled discrimination

On Dr. Kavianpour's claim that BOR terminated her because it regarded her as having a substance abuse disorder, the District Court erred by finding that there was insufficient evidence to establish discriminatory causation. [Doc. 269 at 34] As

---

[15]    The recent decision of *Augusta Judicial Circuit Office of the Pub. Def. v. Hodge-Peets*, 370 Ga. App. 819, 821 (2024) held that State agencies have 11th Amendment Immunity to claims brought under the ADAAA. Consequently, Dr. Kavianpour could maintain her ADAAA claim against AUMC, which touts itself as a private employer, and she can maintain her Rehabilitation Act claim against BOR.

35

shown below BOR (A) regarded Dr. Kavianpour as having a substance abuse impairment, (B) proffered an insufficient legitimate nondiscriminatory reason for her termination, which (C) was pretextual.

The lower Court erred by requiring comparators to make out a prima facie case of disability discrimination. [Doc.269 at 24 & 34-35] In *Lewis v. City of Union City*, the Court found the prima facie case satisfied for regarded-as-disabled discrimination based on circumstantial evidence including statements from the decisionmakers, without requiring proof of comparators. 934 F.3d 1169, 1183-84 (11th Cir. 2019) (addressing "the third element of the *prima facie* case which requires evidence sufficient to permit the fact finder to conclude that the employee was discriminated against 'because of' her disability"). And in *Barber v. Cellco P'ship*, which the lower Court relied on [Op. Doc.269 at 24 & 34-35], the Court recognized that other forms of circumstantial evidence could suffice like temporal proximity. 808 F. App'x 929, 935 (11th Cir. 2020).

The lower Court also erred by finding that Plaintiff had waived consideration of a convincing mosaic approach. [Doc.269 at 24 & 36] Although Dr. Kavianpour only expressly mentioned 'convincing mosaic' in a footnote, the substance of her brief showed that the totality of the circumstances established discrimination. [Doc. 230 at 19-23 & 25-30] By addressing the totality of the evidence Appellant asserted a "'convincing mosaic' of circumstantial evidence [which] is simply enough

36

evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023) *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023) ("a 'convincing mosaic' is a metaphor, not a legal test and not a framework"). Appellant's discussion thereby "contained sufficient argument and analysis to allow the court to meaningfully address [her] argument." *Nukote Int'l, Inc. v. Office Depot, Inc.*, No. 09-82363, 2011 U.S. Dist. LEXIS 76088, at *5 (S.D. Fla. July 14, 2011).

### A. BOR regarded Dr. Kavianpour as having a substance abuse disorder when terminating her.

The year-long drug monitoring program of Dr. Kavianpour and the allegation that she missed her last drug test, show that she was being regarded as having a substance abuse disorder when BOR terminated her. Considered under *McDonnell Douglas* this supports a prima facie case and shows one tile of a convincing mosaic.

The lower Court erred by finding that BOR, when imposing the challenged year-long monitoring on August 21, 2018, regarded Plaintiff as a mere drug user. [Doc. 269 at 22-33] As to the requisite severity or frequency of substance abuse to be an "impairment," the ADA specifically directs that even "minor" impairments are protected (if, as in this case, they had a perceived duration of longer than six months), 42 U.S.C. § 12102(3)(B) and that even "episodic" or occasional impairments are

protected (if, as with substance abuse disorder, "it limits a major life activity when active") 42 U.S.C § 12102(4)(D).

A drug monitoring program for a full year suggests that it was for a substance abuse disorder with a risk of relapse. Indeed the original draft of the August memo was for six months, but BOR switched it to the "longer duration" of one year, that applies to the "addiction/legal review arena." [Doc. 186-14 at 12-13]. BOR 30(b)(6)'s deponent stated that the testing was because Dr. Kavianpour "potentially was abusing substances" [Doc. 193 at 27:13- 28:3], and Dr. Macomson said it was to "prove that, you know, there is not a problem here." [Doc. 178-12 at 391] Norton stated that in testing Kavianpour they were "following a precedent that had been established with another resident in 2013 … [to] provide a urine sample that allowed us to be confident that they were not, in fact a drug user" [Doc. 194-14 at 36:22- 37:5]. Based on her notes, Susan Norton imposed the same monitoring program previously imposed on a resident who was monitored like a "recovering addict." [Doc. 194-23 at 3; Doc. 194 at 223:20-224:17, 236:4-237:17] Although Susan Norton scratched out the word 'addict," and denied remembering what that meant, the note says what it says, for the jury to construe in the totality of the circumstances. [*Id.*] The District Court erred [Doc. 269 at 28 & n.12] by crediting Susan Norton's "do-not-recalls" when credibility is for the jury. At the same time that BOR was discussing long term monitoring for a resident who self-reported addiction issues

38

and signed up for PHP, BOR similarly decided to impose long term monitoring on Dr. Kavianpour. [Doc 186-14 at 14] The reasonable inference is that BOR regarded Dr. Kavianpour as having a substance abuse disorder with an inability to refrain.

BOR also knew that Laurel Jones had reported that Dr. Kavianpour allegedly told her in August "when I was stressed I smoked, almost every day," while in medical school. [Doc. 207-48 at 2-3; Doc. 207-2 (BOR SOMF ¶¶37- 38)] On August 22, 2018, AUMC and BOR agents including Debra Arnold who imposed the drug monitoring, discussed Dr. Kavianpour's (alleged) "chronic" marijuana use and decided to also require her to enroll in the Georgia Professional Health Program (PHP), [Doc. 208-10 at 2-4; Doc. 186-14 at 6] which Arnold admitted was "related to addiction." [Doc. 186 at 40:5-15]

When BOR terminated Dr. Kavianpour its reasons were inextricably intertwined with the drug monitoring and its perception of her as having a substance abuse disorder. Dr. Macomson testified that the February 13th missed test was the but-for reason for her suspension and ultimate termination. [Doc. 187-9 at 174:11-175:5; Doc. 192 at 172:10-19]. The reason BOR sought to take an adverse action and then approached Dr. Coule was because of a purported "failure to comply with the random drug testing." [Doc. 194-18 at 2, 10] BOR's LNR was formerly two-pages and supported Plaintiff's regarded-as claim. [Doc. 146-6 at 18-19] By relying

39

on the allegedly missed drug test to terminate Dr. Kavianpour, BOR regarded her as having a relapse or hiding a substance abuse disorder.

## B.    BOR's purported legitimate nondiscriminatory reason is insufficient.

BOR's purported legitimate nondiscriminatory reason for terminating Dr. Kavianpour, that her access was suspended by Dr. Coule, is insufficient. [Doc. 207-1 at 15.] The Court's contrary conclusion is erroneous. [Doc. 269 at 36-37]

In articulating a legitimate nondiscriminatory reason, "the defendant's response must frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Alvarez v. Royal Atl. Devs.*, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). "The defendant may not satisfy its burden by presenting a hypothetical reason for the employment decision in question." *Voudy v. Sheriff of Broward Cnty. Fla.*, 701 F. App'x 865, 869 (11th Cir. 2017). BOR's reason is hypothetical and unclear because BOR never explains why a "suspension" requires a termination. A suspension, by its plain meaning, is temporary, but BOR has not explained why it justified permanently terminating Kavianpour. [Doc. 207-1 at 15.]

An asserted reason is also insufficient if it is "irrelevant" to explain why other employees were not terminated for the same reason. *Williams v. Montgomery*, 742 F.2d 586 (11th Cir. 1984) (policy to terminate for felony conviction was insufficient

40

when others with felony convictions not terminated). Dr. Coule indicated that he had suspended other residents' 'privileges' in the past, but his suspensions did not result in immediate terminations by BOR; Dr. Coule claimed that BOR has discretion to take action other than termination in response to a suspension. [Doc. 177-2 at 95:25-98:5.] Dr. Coule testified that an "investigation" and "clinical competency hearing" should have followed, but did not. [*Id.* at 102:4-106:20]

Timing matters. BOR's duty was to produce a reason why she was immediately fired in conjunction with suspension, even if she could have been terminated later. When someone is fired "sooner than she otherwise would have been, … that is enough to establish the adverse action element of her retaliation claim." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268, (11th Cir. 2010). In other words, even if "[BOR] had been planning to fire [Kavianpour] anyway" that reason is insufficient. *Id.* at 1269. Two other suspensions by Dr. Coule did not immediately result in terminations by BOR. [Doc. 230-2 at 25 ¶111]. The Court erred by finding that this supported BOR's position that a suspension could warrant termination. [Doc. 269 at 40] Instead it shows that she was terminated prematurely in conjunction with the suspension.

41

**C.    BOR's reason for the termination is pretext for its unlawful motives.**

BOR's stated reason for the termination is that the suspension of Plaintiff's hospital access justified termination [Doc. 207-1 at 15 & 24-25] When an employer's asserted reason is knowingly false or "dishonest," "the trier of fact can reasonably infer that the employer is dissembling to cover up a discriminatory purpose." *Reed v. Forney Indus.*, Inc., 800 F. App'x 782, 786 (11th Cir. 2020) (citation omitted).

BOR knew that a suspension did not require immediate termination as reflected in handwritten HR notes and emails [Doc. 230-2 Add. SOMF. p.21-22 ¶100 p.24-25 ¶¶109-110]. On February 18, 2019, handwritten notes indicate Plaintiff was owed "grievance processes student & employee." [Doc. 208-10 at 10] Similarly, on February 19, 2019 Susan Norton emailed Drs. Macomson and Vale a draft of a *two-week suspension* notice for BOR to issue to Dr. Kavianpour if Dr. Coule elected to suspend her hospital access, showing termination was not required. [Doc. 207-41 at 10-11(emails) & 14(suspension letter); *see* Add. SOMF Doc. 230-2 ¶110]

BOR had ultimate authority over Dr. Kavianpour's clinical access. Dr. Kavianpour's employment contract specifies that "procedures for discipline and redress of grievances" are governed by House Staff Policies [Doc. 3-2], and HS 13.0 applies "for disciplinary actions" [Doc. 178-6 at 1]. The "Terms and Conditions of

42

Housestaff Service to AU Health" (T&C) §9 and 6b provide that BOR investigates a suspension (or denial of access) and has the authority over resident discipline and clinical access. [Doc. 178-13 at 3-4.] The Court erred by applying medical staff rules to a resident regarding the exception to disciplinary action. [Doc. 269 at 39 n.17] The disciplinary action exception for "Safety" is specifically intended for "medical staff," not residents [Doc. 178-13 as 4].[16] Therefore, BOR–not AUMC–"shall have the sole right to determine whether to take any disciplinary action against the student, resident" [*Id.*]. Testimony from Dr. Coule and Dr. Macomson as BOR's 30(b)(6) deponent confirms that BOR had the authority to investigate and phase out or overturn the suspension. [See Doc. 177-2 at 23:18-24:16, 92:12-94:22; 101:15-102:15; 106:8-20; Doc. 230-2 Add. SOMF. p.21-22 ¶100 (compiling evidence)].

The District Court erroneously relied on a counseling form to support BOR's position that the suspension warranted termination. [Doc. 269 at 40-41] However, the form [Doc. 192-17 at 1-2] is not a contract and cannot supplant Plaintiff's contract [Doc. 3-2] and BOR and AUMC agreed that Plaintiff's contract established "the process for removal of residents from clinical duties for cause" [Doc. 178-13 at 3 (¶6b)]. The February 11th meeting, counseling form and its content are disputed.

---

[16]    It is undisputed that "Plaintiff was Housestaff and not Medical Staff." [Doc. 245 at 30-31 ¶31] If Plaintiff were medical staff, then "Corrective Action" and "Right to Hearing" provisions of the Bylaws should apply. [Doc. 190-13 at 13, 15].

43

S*ee* Doc. 230-1 (Pl. Resp. SOMF) at 78-86 ¶¶81-84, 125-126 ¶122 at 78-86, 125-126.

Pretext is also shown because BOR and AUMC are each trying to shift the blame to the other to cover themselves. AUMC's decisionmaker Dr. Coule repeatedly emphasized that "[a] suspension is the temporary action that is taken to ensure patient safety. It's not a revocation; it's not a permanent action. The actions taken by the University … then follow." [Doc. 177-2 at 94:9-19; *see* Pl.'s SOMF Doc. 230-2 ¶100 (compiling citations)] BOR however maintains that the suspension was permanent or irrevocable. [Doc. 207-1 at 15]

### 1.    Pretext is shown by concealing the actual decisionmaker.

Pretext is also shown when an employer conceals the actual decisionmaker. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151-53 (2000); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 285 (3d Cir. 2000). BOR argues that Drs. Macomson and Vale made the termination decision [*see* Doc. 230-1 Pl. Resp. BOR SOMF at 147-149, 162-165 ¶¶145 & 157], concealing that the actual decisionmakers were Dr. Coule, HR and Legal.

Drs. Vale and Macomson testified that they were "[n]ot really" the "decision-makers … [about] whether to elect discharge." [Doc. 197 at 139:2-17] When Drs. Vale and Macomson discussed discipline their "first reaction was to -- probation," [Doc. 197 at 120] or a two-week suspension without pay. [Doc. 209-12 at 11; Doc.

186-17] AUMC-BOR HR told Drs. Macomson and Vale that the suspension by Dr. Coule required termination. [Doc. 178-1 at 117:3-118:2; Doc. 192 at 47:12-18]. The actual decisionmaker for the termination was AUMC and BOR HR (Norton and Arnold), Dr. Coule, and AUMC and BOR in-house counsel Greg Bryan and Clark Speese who all participated in the joint suspension-termination. [Doc. 203-29 p.9 (Dr. Vale's statements on Feb. 22, 2019, that HR decided); Doc. 190 at 83:16-84:14 (similar); Doc. 197 at 127:12-128:11, 139:2-17, 150:11-25 (Dr. Coule decided); Doc. 192 at 99:21-100:4 (same); Doc. 194 at 140:19-142:1, 169:11-13, 193:1-18 (Greg Bryan and Clark Speese were involved); Doc. 195 at 43:7-49:20 (same); *see also* Pl.'s SOMF Doc. 230-2 ¶¶103-122 (communications between these individuals)]

### 2.    The circumstances of the allegedly missed test.

The circumstances surrounding the allegedly missed drug test on February 13, 2019 also demonstrate pretext. First, on February 13th, Arnold emailed Laurel Jones but did not confer about patient responsibilities or coverage [Doc. 208-7 at 1], despite Arnold's promise in her January 31, 2019 email to contact and confer with the "Residency Program Director or designee" to determine "if clinic responsibilities would interfere" before requiring a test. [Doc. 186-11 at 2]. Laurel Jones, the purported "designee" [Doc. 230-1 at 128 ¶124; Doc. 178-20 at 1], admitted that

45

"[t]here was not a designated person" [Doc. 178-12 at 230:15-231:20], and Dr. Macomson neither received notice nor provided coverage [Doc. 192 at 94:2-17].

Second, BOR should have allowed her to test when she showed up and tried to submit for drug testing on February 14. [Doc. 192 at 115:17-117:21(HR blocked submission); Doc. 186 at 107:20-25; Doc. 194 at 118:4-11 (Norton and Arnold admitted that Feb. 14 submission was permissible under USG policy); Doc. 194-8 at 4 ¶7 (policy allowing voluntary submission to resolve any "doubt")]

Third, BOR's Dr. Vale's offer of a solution to take Dr. Kavianpour's pager while she submitted her drug test shows an easy solution BOR should have implemented to prevent the suspension-termination. On February 14, 2019, Dr. Vale offered a solution to Dr. Kavianpour to provide patient coverage by taking the on-call neurosurgery pager for Dr. Kavianpour to present in HR's window for future monthly drug tests. [Doc. 178-12 at 204:9-17; Doc. 197 at 80:1-5; see Doc. 194 at 290:1-4; 293:22-294:2; 294:23-295:13 (Norton learned of solution before suspension-termination)]

### 3.    Deviations from standard procedures.

An employer's deviation from its own standard procedures may serve as evidence of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). Contrary to the District Court's findings [Doc. 269 at 41-43], BOR's deviation from its policies suggests discrimination.

46

First, BOR's policies provided for an investigation after a suspension to determine whether the suspension should be rescinded [Doc. 172-2 at 23:2-5, 91:12-93:22], but no such investigation occurred. [Doc. 192 at 50:3-16.] Because Appellant was suspended for allegedly having a substance abuse disorder, pretext is shown by BOR's deviation from the legal standard for showing a direct threat to patient safety: individualized consideration of the objectively best available evidence. *Milligan v. Rambosk*, No. 2:20-cv-403-FtM-29MRM, 2022 U.S. Dist. LEXIS 32773, at *26 (M.D. Fla. Feb. 24, 2022) ("Sheriff's stated safety reason was pretextual because it was not formed in compliance with the legal standard" for showing a direct threat); *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 481 (5th Cir. 2006). BOR failed to evaluate the objective evidence that she could safely perform her job in light of her string of negative drug tests and successful work performance from July 2018 through February 21, 2019. [*See* Doc. 229 at 32-35, Pl's. Br. in Reply to AUMC at Section D] The court erred by overlooking the legal standard for ADAAA that requires an investigation process. [Doc. 269 at 42] The Court also erroneously concluded that policy "simply contemplated an investigation, it did not require one,"

[*id.*] when the policies[17] and testimony[18] show that an investigation was supposed to be an automatic response to the denial of access.

Second, on February 8, 2019, BOR attorney Greg Bryan, directed Dr. Macomson to manufacture alleged performance issues regarding Dr. Kavianpour (one week after she objected to the testing), that he "would recommend that these problem areas be fleshed out in more detail in her file…I can already sense that we are headed for a rough time with this resident." [Doc. 186-16] On February 11, 2019, Drs. Macomson and Rahimi, issued a counseling notice alleging performance issues that were completely unrelated to the drug testing and providing a twelve-week remediation plan. [Doc. 178-8.] But BOR failed to provide Dr. Kavianpour the required notice, remediation period, and mentoring to address pretextual performance issues before terminating her February 2019, as the ACGME confirmed when it found AU to be in "substantial noncompliance" with HS policies. [Doc. 196-2; Doc. 171-2(ACGME citation) at 2-3]

---

[17]    Under the "Terms and Conditions of Housestaff Service to AU Health," [Doc. 178-13 at 4]: "Within 24 hours of this action in denying access, AU Health will notify AU of this action and the reasons therefore. AU Health will provide all information reasonably requested by MCG relating to the denial of access and shall cooperate in AU's investigation of the denial." *See also* Section 5.1 of the Medical Staff Bylaws [Doc. 190-13 at 13].

[18]    According to Dr. Coule, BOR was required to, but did not provide, an investigation into an AUMC suspension of clinical activities decision [Doc. 177-2 (Coule Dep.) 102:4-106:20].

48

Third, BOR attorneys interfered with the Interim Chief Compliance Officer John Lott's investigation into Dr. Kavianpour's discrimination and retaliation complaints about her drug testing and John Lott was abruptly fired after issuing a report favorable to Dr. Kavianpour. [Doc. 209-8 at 2, 4-18, 21-23 ¶¶6, 8, 12-75, 88-98]. Fourth, although Debra Arnold included Dr. Kavianpour's DUI arrest in her February letter to Dr. Coule, DUI arrests of residents are not routinely reported to Dr. Coule as a matter of patient safety. [Doc. 177-2 at 65:22-65:4.] Fifth, BOR failed to provide Dr. Kavianpour the contractually required GME hearing she requested in March 2019, [Doc. 216 at 8 ¶¶40-42; Doc. 186-12] and only purported to provide one ten months later on January 7, 2020. [Doc. 192-25 (Dr. Macomson indicated Dr. Kavianpour was entitled to review of suspension); Doc 197-18; Doc. 197 at 185:11-14 (suspension not reviewed in 2020 process).] A BOR attorney explained that "AUMC and [BOR's] GME has exclusive rights over privileges for resident physicians …an 'appeal right' … **must** be offered in some format." [Doc. 192-23 (emphasis original)] The GME Manager stated that "[Dr. Kavianpour's] dismissal [on February 21, 2019] was different from most and because the hospital terminated her for patient safety concerns then she was notified of termination." [Doc. 221-14 at 1]

49

**VII.**       **AUMC retaliated against Dr. Kavianpour by suspending her.**

For Dr. Kavianpour's retaliation claim against AUMC, the District Court erroneously found (A) that Dr. Coule was unaware of her protected activity [Doc. 269 at 58-59] and alternatively (B) that AUMC had a legitimate non-discriminatory reason that was not pretextual. [*Id.* at 61] These findings misconstrue the evidence and draw inferences in favor of AUMC.

**A.       Dr. Coule's awareness of Plaintiff's protected activity.**

The District Court does not dispute that Dr. Kavianpour's emails in January were protected activity complaining about the drug testing and the timing of tests as violations of the ADA. [Doc. 269 at 54 & 58; Doc. 186-11 at 3 (January 22 email); *id.* at 1 (January 31, 2019, email)].

Dr. Coule confirms having seen both Dr. Kavianpour's January 22 email, i.e. "the e-mail where she was asking to meet with [HR]" [Doc. 177-2 at 120:4-19] and Arnold's January 31 response email to Dr. Kavianpour's January 22 email. [Doc. 177-2 at 67:1-14] The natural inference is that HR showed him the email thread including Dr. Kavianpour's January 31 email, as Dr. Coule stated that Arnold's January 31 email was "provided to me when I asked for documentation around the -- the February date of the suspension" [Doc. 177-2 at 67:1-14], and that, when asked about the January 22 email and the "course of discussion concerning the drug testing" between Dr. Kavianpour and HR he refers to having known "what was

50

recounted in the emails." [Doc. 177-2 at 120:4-19] Dr. Coule never denied receiving the emails, and the Court erroneously credited and placed dispositive weight on his conflicting testimony, years later, claiming not to *recall* whether he had received them. [Doc. 269 at 12 & 59] The District Court erred by equating what Dr. Coule remembered at deposition, which the Court found to be too "general" [Doc. 269 at 60], with what Dr. Coule knew at the time, namely "what was recounted in the emails," which are specific.

The District Court also erred by finding that it could not be reasonably inferred that Dr. Coule learned of Plaintiff's protected complaints from AUMC's lawyer Clark Speese and his meeting with BOR HR Arnold and Norton. [Doc. 269 at 60-61] Dr. Coule got advice about whether to suspend Dr. Kavianpour from Clark Speese [Doc. 177-2 at 106:25-107:7] who undisputedly had knowledge of Dr. Kavianpour's complaints[19] and played a role in the suspension-termination. *See supra* § VI (C). And Dr. Coule admits that he heard about Plaintiff's complaints "in the meeting that – [he] had with them" [Doc. 177-2 at 120:4-122:6] referring to a meeting with BOR HR about whether to suspend Dr. Kavianpour. [Doc. 197 at 128-29 & 138-39 (discussing meeting)] BOR HR, Arnold and Norton, received the protected emails from Dr. Kavianpour. [Doc. 186-11 at 1 & 3]

---

[19]     On February 3, 2019, Norton forwarded Dr. Kavianpour and Norton's emails from January 22 and 31 involving Dr. Kavianpour's objections to Speese. [Doc. 186-11; Doc. 208-10 at 5 (involved in writing the January 31st memo)]

51

Finally, Dr. Coule testified that the "only details that were provided to me, that I can remember anyway, was that she claimed that she could not go across the street to test because that somehow caused a patient safety concern which is not true." [Doc. 177-2 at 120:4-122:6] On February 13, 2019, upon being notified it was a "test day," Dr. Kavianpour told Arnold she could not test because she was on pager duty and was unable to transition patient care. [Doc. 189 at 236:7-237:25, 77:21-78:5, 119:17-24.] Dr. Coule knew Dr. Kavianpour did not test because she was fulfilling her on-call pager and patient care obligations. [Doc. 187-5; Doc. 190 at 61:3-62:20; Doc. 178-12 at 86:23-87:2 (same).] Dr. Kavianpour, by attending to her clinical duties in the hospital to prioritize patient care before presenting for testing on the morning of February 14, 2019, [Doc. 186 at 124:24- 125:3; Doc. 186-21 at 1], was engaging in opposition to the unreasonable short time frame for the drug test and lack of adequate on-call pager coverage, which demonstrates protected activity, "not by instigating action, but by standing pat." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276- 78 (2009). In the context of Dr. Kavianpour's prior complaints about the testing window and lack of patient coverage, delaying her test until the next morning would be understood as protected oppositional conduct.

52

**B.    AUMC's proffered reason is insufficient and pretextual**

AUMC's proffered legitimate reason for the suspension is insufficient and pretextual, and the District Court erred by finding to the contrary. [Doc. 269 at 61] As already discussed, *see supra* § IV, AUMC did not proffer any legitimate independent reasons for the suspension, only discriminatory ones. And Dr. Coule stated that a reason for the suspension was, as he characterized Dr. Kavianpour's complaints about and opposition to the drug testing, "subversive" behavior. [Doc. 177-2 at 88:15-89:1]. *See EEOC v. Comcast of Ga., Inc.*, 560 F. Supp. 2d 1300, 1312-13 (N.D. Ga. 2008) ("[c]omments or remarks that suggest discriminatory animus can … serve as circumstantial evidence to establish pretext"). In *Alvarez v. Royal Atl. Developers, Inc.*, the Eleventh Circuit found that the proffered reasons, that the plaintiff's complaints showed (1) that their working relationship was damaged and (2) "that [the plaintiff] might vindictively use her position as controller … to sabotage the company's operations," were not legitimate reasons. 610 F.3d 1253, 1269-70 (2010). Dr. Coule's allegation that a patient safety threat was demonstrated by subversive or bad judgment stemming from her objections to the drug testing are, as in *Alvarez*, too closely connected to, or recharacterizations of, protected activity to be legitimate reasons.

Pretext is further shown by Dr. Coule's claim that he merely issued a temporary suspension of Dr. Kavianpour [Doc. 177-2 at 94:9-19; *see* Pl.'s SOMF

Doc. 230-2 ¶100 (compiling citations)], but in fact Dr. Coule and Clark Speese were involved in terminating her. *See supra* § VI(C)(1). The circumstances surrounding the allegedly missed test on February 13, that Dr. Kavianpour followed policy, tried to obtain pager coverage, and went to test the next morning but was blocked, demonstrate that she was not a threat to patient safety. *See supra* § VI(C)(2).

Alternatively, HR's Debra Arnold and Susan Norton, acting as agents of AUMC[20] (and BOR), used Dr. Coule as their cat's paw to effectuate their retaliatory animus. But for HR imposing stringent testing requirements, forcing Dr. Kavianpour to miss a drug test on February 13, 2019, *see supra* § VI(C)(2), Dr. Coule would not have suspended. Dr. Coule said he would "likely not" have suspended Dr. Kavianpour's privileges but for her purported failure to appear for drug testing on February 13, 2019. [Doc. 187-9 at 174:11-175:5.] That appearance was created by Arnold when she did not follow her own January 31st memo and check with the Program Director or designee that clinical activities would not interfere with Dr. Kavianpour's ability to test [Doc. 186-11 at 2; Doc. 190 at 195:8-197:1], forcing Dr. Kavianpour to miss the test. The causation for the cat's paw doctrine is established when the biased employee "somehow manipulate[s] the decisionmakers … into terminating" the plaintiff. *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20

---

[20]     Susan Norton was Vice President of HR for the university and the hospital. [Doc. 194 at 43:11-19] And Arnold was working under her supervision [Doc. 186 at 44 pp. 53:17-22; 174:11-14]

(11th Cir. 1999) (citation omitted); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (a supervisor "set up [the plaintiff] to fail by assigning him an unpromising [sales] territory … [and] portray[ed] [his] performance … in the worst possible light").

## VIII.  BOR terminated Dr. Kavianpour in retaliation for her protected complaints.

The District Court assumed that Dr. Kavianpour had satisfied her prima facie case under *McDonnell Douglas*, but erred in finding that BOR had submitted a sufficient and non-pretextual reason for the termination of Dr. Kavianpour. [Doc. 269 at 55-57]

Appellant incorporates her arguments showing BOR's proffered reason was insufficient and pretextual. *See supra* § VI(B)-(C).

Evidence of AU counsel Greg Bryan's retaliatory animus also establishes pretext. Exactly one week after she objected to the legality of the testing, on February 7, 2019, Dr. Macomson sought advice from Dr. Moore and Greg Bryan (AU counsel) to raise issues about Dr. Kavianpour's performance. [Doc. 201-11] On February 8th, Greg Bryan directed Dr. Macomson to "flesh out" alleged performance issues because he could tell they were, "headed for a rough time with this resident" because of her "objections to this, that, and the other thing." [Doc. 186-16; Doc. 201 at 97:1-98:12] Greg Bryan's reference to Dr. Kavianpour's protected "objections" is

strong evidence of his retaliatory animus. [*See* Pl.'s SOMF Doc. 230-2 ¶¶112-22] The District Court erred by finding that Greg Bryan's involvement was irrelevant because he was not a decisionmaker. [Doc. 269 at 56-57] In fact he worked with BOR HR and AUMC to decide on a simultaneous suspension-termination. [*See* Pl.'s SOMF Doc. 230-2 ¶¶112-22]

BOR HR also revealed its retaliatory animus. In response to Dr. Kavianpour's protected activity in her January 22, 2019 email, Arnold's retaliatory January 31, 2019 email/memo response [Doc. 186-11 at 2-3] did not address her complaints or request for a meeting and instead, as the Magistrate Judge previously found, "[d]efendants refused and responded with a retaliatory memo that made her objections grounds for dismissal." [Doc. 61 at 97].

Finally, the temporal proximity of the February 21 suspension-termination following on the heels of Dr. Kavianpour's protected activity on January 22, 31, and February 13, is part of the evidence of pretext. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298-99 (11th Cir. 2006) (finding pretext based in part on temporal proximity of two weeks).

## CONCLUSION

This Court should reverse the dismissal of the Fourth Amendment, Due Process, and breach of contract claims [Doc. 69] and the grant of summary judgment on the disability discrimination and retaliation claims. [Doc. 269].

Respectfully submitted this 6th day of September 2024.

BUCKLEY BALA WILSON MEW

/s/ Edward D. Buckley
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@bbwmlaw.com
Anita K. Balasubramanian
Georgia Bar No. 372029
abala@bbwmlaw.com
600 Peachtree Street NE, Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101

LAW OFFICE JOHN P. BATSON

/s/ John P. Batson
John P. Batson
Georgia Bar No. 042150
jpbatson@aol.com
1104 Milledge Road
Augusta, GA 30904
Telephone: (706) 737-4040
Facsimile: (706) 736-3391

*Attorneys for Appellant Dr. Kavianpour*

57

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,927 words as counted in Word 10.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using combination Microsoft Word 10 and 11 in 14-point Times New Roman.

Respectfully submitted this 6th day of September, 2024

/s/John P. Batson
JOHN P. BATSON
Ga. Bar No. 042150
Attorney for appellant

**CERTIFICATE OF SERVICE**

This is to certify that the undersigned attorney did this date serve a copy of the within and foregoing Appellant's Opening Brief on counsel of record for the above named Appellees by one or more of the following method(s):

☐ Depositing the same with the United States Postal Service thereon to the following address(es):

> Daniel W. Hamilton
> Plunkett Hamilton Manton & Graves, LLP
> 429 Walker Street, Upper Level
> Augusta, Georgia 30901
> dhamilton@phmglaw.com
>
> Christopher M. Carr
> Bryan K. Webb
> Katherine P. Stoff
> Ryan A. Kolb
> Department of Law, State of Georgia
> 40 Capitol Square S.W.
> Atlanta, Georgia 30334
> ccarr@law.ga.gov
> bwebb@law.ga.gov
> kstoff@law.ga.gov
> rkolb@law.ga.gov
>
> Robert C. Threlkeld
> Elliott L. Coward
> Morris, Manning & Martin, LLP
> 3343 Peachtree Road, NE, Suite 1600
> Atlanta, Georgia 30326
> rct@mmmlaw.com
> ecoward@mmmlaw.com

☒ E-mailing a copy of the same through the court's e-mailing system:

Respectfully submitted this 6th day of September, 2024.

/s/John P. Batson
JOHN P. BATSON
Ga. Bar No. 042150
Attorney for appellant